**Appeal of County of Fayette.**

Supreme Court of Pennsylvania.

Argued March 9, 1998.

Decided March 25, 1999.

66

J.E. Ferens, Jr., Uniontown, for County of Fayette.

Howard Ulan, Harrisburg, for Department of Public Welfare.

Etta Warman, Uniontown, for J.M.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

NIGRO, Justice.

Appellant, the County of Fayette, appeals from the Superior Court's determination that the County improperly issued a warrant, pursuant to 50 P.S. § 7302 of the Mental Health Procedures Act ("MHPA"),[1] for the emergency involuntary examination of Appellee, J.M. For the reasons stated below, we reverse.

On January 11, 1996, Mr. Patrick Morrison, the Supervisor of the Emergency Service Unit of Chestnut Ridge Counseling Services, Inc. in Uniontown, Fayette County[2] received reports concerning the mental well being of Appellee. Specifically, Mr. Morrison received referrals from members of Appellee's family as well as local agencies, including the F.B.I. and the Attorney General's office, stating that Appellee had been calling them repeatedly. After contacting Appellee by phone, Mr. Morrison and Officer Sisler of the Uniontown Police

1. Act of July 9, 1976, P.L. 817, No. 143, § 101 *et seq.*, 50 P.S. § 7101 *et seq.*

2. The Emergency Service Unit of Chestnut Ridge Counseling Services, Inc. had been delegated by the Fayette County Mental Health Administrator to handle emergency services under the MHPA.

Department went to Appellee's home.[3] When Appellee came to the door, Mr. Morrison and Officer Sisler identified themselves and asked if they could speak with her. Appellee closed the blinds and locked the door. While Appellee did speak with Mr. Morrison and Officer Sisler through a screen door, Appellee refused to allow them into her home despite assurances by Mr. Morrison and Officer Sisler that they would not harm her in any way. Appellee told Mr. Morrison and Officer Sisler that she was a federally protected witness and would not speak with anyone of authority, except the F.B.I. Mr. Morrison observed that Appellee, who kept referring to Mr. Morrison as "Don" despite being told several times of Mr. Morrison's actual name, was guarded, disheveled, and had a contusion to her right eye which she refused to discuss.

Based on his observations of Appellee and the information he had received from others, Mr. Morrison completed an application for a warrant for the emergency mental health examination of Appellee pursuant to section 7302 of the MHPA ("section 7302"). The application recorded Mr. Morrison's belief that Appellee was severely mentally disabled and presented a clear and present danger to herself, and read:

> [Appellee] has made many calls to law enforcement agencies, i.e. FBI, City Police, Attorney General's office, [Pittsburgh] rape hotline and many others. She is very delusional in that she feels that she is a federally protected witness. She is very paranoid and guarded. She would not allow us in the home. She was disheveled with a contusion to her right eye. She said that she would speak only to the FBI. At this time, she is clearly unable to care for herself. She would benefit from inpatient care.

*In re J.M.*, 454 Pa.Super. 276, 281, 685 A.2d 185, 188 (1996). Stephanie Franczyk, an authorized delegate of the Fayette County Mental Health Administrator, reviewed and signed the

---

**3.** Mr. Morrison testified that this visit was made as part of the mobile crisis service available through the Crisis Unit at Chestnut Ridge Counseling Services, Inc. N.T., 2/8/96, at 10, 13. Mr. Morrison further testified that he requested police assistance with the mobile crisis visit because he had been informed by two of the reporting individuals that there was a gun in Appellee's home. *Id.* at 33.

section 7302 warrant, thereby authorizing a peace officer or a representative of the County Administrator to take Appellee to a facility for an emergency examination.

Mr. Morrison returned to Appellee's home, this time accompanied by two police officers. Again, Appellee would not let them into her home. Mr. Morrison and the officers spoke with Appellee through a closed door for approximately forty-five minutes, during which time Appellee was speaking on the phone with her sister in Connecticut. While Mr. Morrison and the officers were attempting to speak with Appellee, a dispatch came over the police radio that a call had been received from both Appellee's mother and sister which indicated that Appellee was threatening to shoot herself and her adult son who lived with her. Fearing for the safety of both Appellee and her son, the officers forcibly entered Appellee's house and found Appellee pointing a loaded gun at them. With the help of Appellee's son, Appellee was disarmed and taken into custody pursuant to section 7302 of the MHPA. She was transported to Uniontown Hospital for an emergency mental health examination.[4]

At the hospital, Dr. Cesar Noche examined Appellee. Dr. Noche determined that Appellee was severely mentally disabled, in need of mental health treatment and should be admitted pursuant to section 7302, which allows for involuntary emergency treatment for up to five days. Appellee was then transferred to Highlands Hospital where she was diagnosed by Dr. Joel Last as suffering from a delusional disorder and in need of continued treatment. A petition for extended involuntary treatment pursuant to 50 P.S. § 7303, which provides for a twenty day commitment, was filed. Following a hearing before the Fayette County Mental Health Review Officer ("MHRO"), the petition was granted. The hospital then sought a further extension pursuant to 50 P.S. § 7304,

4. After Appellee was taken to the hospital, Mr. Morrison amended the section 7302 warrant application to include the following: "when serving the 302, [Appellee] threatened to shoot herself and her 23 year-old son and in fact, pointed a loaded automatic pistol at police and MH delegate. She is clearly a danger to herself and others." *In re J.M.*, 454 Pa.Super. at 284, 685 A.2d at 189.

which provides for involuntary treatment for up to ninety days. Following a hearing, the MHRO certified that Appellee was in need of continued involuntary treatment and recommended that Appellee be committed to Torrance State Hospital. Judge Solomon of the Court of Common Pleas of Fayette County entered an order, dated February 6, 1996, directing Appellee to undergo involuntary in-patient treatment not to exceed the ninety days allowed by 50 P.S. § 7304. Appellee filed a petition for review challenging both the section 7304 order as well as the original emergency commitment procedures, claiming that Appellant did not have sufficient grounds to issue the warrant for an emergency mental health examination.

On February 8, 1996, the trial court held a de novo hearing to consider Appellee's petition for review. The trial court denied Appellee's petition and rejected her claim that the warrant issued pursuant to section 7302 had been procedurally defective. On appeal, the Superior Court reversed. In assessing the validity of the section 7302 warrant, the Superior Court noted that the MHPA and case law provide minimal guidance regarding the standards to be used when evaluating the issuance of a warrant under section 7302. As a result, the Superior Court turned to the criminal procedural standards applicable to arrest warrants and determined that under those standards, the section 7302 warrant did not state sufficient grounds to determine that Appellee was in need of treatment. The Superior Court essentially found that because Mr. Morrison lacked the qualifications to make conclusions regarding Appellee's mental health and because he had not independently verified the information and statements given to him by others,[5] the section 7302 warrant did not satisfy the standard of probable cause and was therefore, insufficient. Judge Hudock dissented, questioning the propriety of the majority's

5. Specifically, the Superior Court noted that Mr. Morrison had not personally observed Appellee make the calls to the local agencies, had not checked with the F.B.I. to see if Appellee was in fact a protected witness and had not attempted to talk to other members of Appellee's family in order to verify the information he had received and observed regarding Appellee's mental health. *See In re J.M.*, 454 Pa.Super. at 282–83, 685 A.2d at 188.

holding that a section 7302 warrant is to be judged by the same standard as an arrest warrant and finding that, in his view, the section 7302 warrant issued in the instant case was sufficient.

■ The County of Fayette filed a Petition for Allowance of Appeal. We granted allocatur to determine whether the validity of a warrant for an emergency mental health evaluation, issued pursuant to section 7302 of the MHPA, should be judged by the same standards employed in reviewing the validity of a criminal arrest warrant.[6] Since we find that it should not, we now reverse.

Section 7302 of the MHPA governs involuntary emergency examinations and treatment, and limits such treatment to one hundred and twenty hours. Section 7302(a)(1) of the MHPA provides:

> Warrant for Emergency Examination. Upon written application by a physician or other responsible party setting forth facts constituting **reasonable grounds** to believe that a person is severely mentally disabled and in need of immediate treatment, the county administrator may issue a warrant requiring a person authorized by him, or any peace officer, to take such person to the facility specified in the warrant.

50 P.S. § 7302(a)(1) (emphasis added).

Once a person is taken to a facility, section 7302(b) of the MHPA directs that the person shall be examined by a physician within two hours of arrival in order to determine if he is

**6.** Although Appellee's involuntary commitment has ended, the issues raised by this appeal are not moot since they are, as both parties agree, capable of repetition and may evade review. *See In re Woodside,* 699 A.2d 1293, 1296 (Pa.Super.1997) (appeals from involuntary commitment orders which have expired are not moot because of the important liberty interest involved and because most involuntary commitment orders expire before appellate review is possible, and thus, challenged procedures could continue yet their propriety would evade appellate review); *In re J.S.,* 387 Pa.Super. 432, 564 A.2d 468 (1989), *rev'd on other grounds,* 526 Pa. 418, 586 A.2d 909 (1991) (explaining that courts normally review MHPA commitment procedures even if the patient is discharged because the procedures are capable of repetition and may otherwise evade review).

severely mentally disabled and in need of immediate treatment. 50 P.S. § 7302(b). If the examining physician determines that the person is severely mentally disabled and in need of immediate treatment, treatment shall begin immediately; if the physician does not so find, the person shall be discharged. *Id.* The preceding section, section 7301, defines who is subject to emergency evaluation or treatment. Section 7301(a) of the MHPA provides:

whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

50 P.S. § 7301(a). Section 7301(b) then sets out guidelines for the determination of when a "clear and present danger" to self or others is present. *See* 50 P.S. § 7301(b)(1), (2).[7]

7. 50 P.S. § 7301(b)(1) and (2) provides:
(b) Determination of Clear and Present danger.—(1) Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated . . .
(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:
(i) the person has acted in such a manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or
(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or
(iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act.

■ In the instant case, Appellant contends that the Superior Court improperly analyzed the issuance of a section 7302 warrant by the standards applicable in criminal procedure. Appellant argues that the independent verification and probable cause standard articulated by the Superior Court is unsupported by the plain language and the purposes of the MHPA. We agree.

In the first instance, the plain language of the MHPA establishes that before an involuntary emergency evaluation pursuant to a warrant under section 7302 may occur, there must be "reasonable grounds" to believe a person is severely mentally disabled and in need of immediate treatment. It does not, contrary to the findings of the Superior Court, require the County Administrator to show the same basis as that required for the arrest of an individual for criminal charges. Thus, the plain language of the Act indicates that the legislature, unquestionably familiar with the standard of probable cause, meant to employ a different standard for the issuance of warrants for emergency mental health evaluations. Accordingly, the words "reasonable grounds" were expressly used to describe the standard which must be met before a warrant pursuant to section 7302 may be issued. *See* 50 P.S. § 7302.

■ In addition to the plain language of section 7302, the recognition that mental health evaluations and commitment proceedings are civil and non-punitive in nature supports a finding that the legislature did not intend for the issuance of emergency evaluation warrants to be based on criminal standards and procedures. Civil commitments have long been distinguished from criminal prosecutions. As the United States Supreme Court expressly recognized in *Addington v. Texas*, "a civil commitment procedure can in no sense be equated to a criminal prosecution." 441 U.S. 418, 428, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323 (1979) (holding that the Federal

For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

Constitution only requires states to use the civil 'clear and convincing,' rather than the 'beyond a reasonable doubt,' standard of proof in involuntary civil commitment proceedings). The *Addington* Court noted that in a civil commitment, as opposed to criminal prosecutions, state power is not exercised in a punitive sense. *Id.; see also McCabe v. Life–Line Ambulance Service, Inc.,* 77 F.3d 540, 552 (1st Cir.1996) (warrantless entry to enforce civil commitment order does not require probable cause and was reasonable in part because such entry was not designed to gather information in criminal investigation, but rather, was to enable the plaintiff temporary hospitalization and the psychiatric examination she refused).

Likewise, the intent of the MHPA is to provide treatment, not punishment, to those in need. Section 7102 of the MHPA explicitly states that the purpose of the MHPA is to "assure the availability of . . . involuntary treatment where the need is great." 50 P.S. § 7102. *See also Commonwealth v. Hubert,* 494 Pa. 148, 152, 430 A.2d 1160, 1162 (1981) (primary intent of MHPA is not to provide punishment for conduct but rather to make involuntary treatment available where need is great); *In re J.S.,* 526 Pa. 418, 425, 586 A.2d 909, 913 (1991) (clear intent of General Assembly in enacting MHPA was to assure that individuals who are mentally disabled will be provided with the medical care they need, for their own health and safety, and for the safety of others). As this Court stated in *In re J.S.,* "if involuntary treatment is all that is available to protect a person from harm and even death, then the availability of this form of medical treatment is to be valued and encouraged." 526 Pa. at 428, 586 A.2d at 914. So as to encourage and assure the availability of involuntary psychiatric care, the legislature has recognized a distinction between the standard used for issuing criminal arrest warrants and the standard to be used for issuing warrants for emergency mental health evaluations.[8]

8.  Other provisions of the MHPA indicate that the legislature recognized the civil character of mental health evaluations and commitment proceedings and did not intend for civil commitment procedures to be evaluated under the standards applicable in the criminal context. *See*

■   The nature and purpose of a section 7302 warrant itself also leads to the conclusion that such warrants are not to be evaluated under the standards established for criminal warrants.  As with all section 7302 warrants, the warrant issued here was one which allowed Appellee to be taken into custody and kept in custody for a maximum of two hours for the purpose of performing an emergency mental health examination.  It was, as stated by the brief filed by amicus curiae, "a warrant to take [Appellee] to the doctor, not to take [Appellee] to jail."  Brief of Commonwealth of Pennsylvania Department of Public Welfare, Amicus Curiae, at 9.  Given the emergency nature and therapeutic purpose of the section 7302 warrant, we agree with Appellant that the "reasonable grounds" standard set forth in section 7302 was not meant to approximate the standards employed in the criminal warrant context.[9]

*In re McMullins*, 315 Pa.Super. 531, 539, 462 A.2d 718, 723 (1983) (in construing section of MHPA, court must view section with reference to the entire statute of which it is but a part).  For example, civil commitments for ninety days or more under the MHPA are permissible upon satisfaction of the civil "clear and convincing" standard, *see* 50 P.S. § 7304(f), as opposed to the "beyond a reasonable doubt" standard required for criminal convictions.  *In re Winship*, 397 U.S. 358, 361, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (criminal conviction only permissible upon finding of guilty beyond a reasonable doubt).  Similarly, under sections 7302–05 of the MHPA, respondents to commitment petitions have no right to a jury trial, unlike the criminal defendant, who has such a right.  *See Commonwealth v. Stokes*, 450 Pa. 167, 172, 299 A.2d 272, 276 (1973). *See also In re Commitment of Hutchinson*, 500 Pa. 152, 158 n. 6, 454 A.2d 1008, 1011 n. 6 (1982) (right of effective assistance of counsel in civil commitment proceedings must be viewed in light of purposes of MHPA and therefore, is not co-extensive with right to effective assistance of counsel in criminal proceedings).  At the same time, the MHPA provides rights to individuals subject to its provisions which are not afforded to criminal defendants.  For instance, the MHPA provides that subject individuals have a right to the least restrictive treatment as well as the right to discharge when it is ascertained that the individual is no longer in need of treatment.

9.   Appellee seems to argue, however, that the principles of due process require section 7302 warrants to be evaluated under the standards established for criminal warrants.  While we fully agree that Appellee is entitled to due process protection, *see* 50 P.S. § 7102, such protection does not require the application of criminal procedural standards to a warrant for an emergency mental health evaluation.  Pennsylvania jurisprudence has consistently noted that the legislature intended the MHPA to create a treatment scheme under which a patient's procedural protections expand progressively as the deprivation of liberty gradually

Moreover, the sole case which has reviewed the sufficiency of a section 7302 warrant also indicates that such warrants were not intended to be analyzed under those standards applicable to criminal warrants. In *Uram v. County of Allegheny*, 130 Pa.Commw. 148, 567 A.2d 753 (1989), the plaintiff filed a 42 U.S.C. § 1983 action against a county employee, alleging in part that the county employee had committed willful misconduct by authorizing a warrant for an emergency examination which failed to meet the statutory standards prescribed by section 7302. In rejecting the plaintiff's claim, the Commonwealth Court noted that the warrant had been based on information received over the telephone from a nurse at a psychiatric institute regarding the plaintiff, who had contacted the nurse at the institute and threatened suicide. The Commonwealth Court concluded that, based on the nurse's telephone call, the county employee "had information which could lead her to believe that [the plaintiff] threatened suicide" and therefore, had sufficient information to issue the section 7302 warrant. *Id.*, 130 Pa.Commw. at 153, 567 A.2d at 756. Clearly, this language used by the court to evaluate the validity of the 7302 warrant does not parallel language used to describe the standards applicable in the criminal warrant context.

Moreover, in reviewing the plaintiff's claim that the information for the emergency warrant had improperly been

increases. *See, e.g., In re S.O.*, 342 Pa.Super. 215, 233, 492 A.2d 727, 737 (1985). As this Court stated in *In the Matter of Sylvia Seegrist:*

> it is clear that the scheme adopted by the legislature [in the MHPA] envisions that more extensive procedural or 'due process' protections will apply as the amount of time a person may be deprived of liberty increases above a bare minimum. For treatment not exceeding seventy-two hours, **minimal procedural safeguards** are available [citing 50 P.S. § 7302].

517 Pa. 568, 539 A.2d 799, 802 (1988) (emphasis added). In light of the emergency nature, therapeutic purpose and short duration of a section 7302 warrant, the criminal due process standards imposed by the Superior Court are more stringent than those necessary to meet the "minimal procedural safeguards" required when issuing a warrant pursuant to section 7302. *See id.; see also Parham v. J.R.*, 442 U.S. 584, 608, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (due process is a flexible concept which calls for such procedural safeguards as the particular situation demands in light of the interests at stake).

taken over the telephone, rather than in a "written application," the *Uram* court stated:

> as a matter of common sense, an Act designed to respond to emergency, life-threatening situations would have little value if the decision-makers did not have the flexibility to act based upon information which they received over the telephone.

*Id.,* 130 Pa.Commw. at 154, 567 A.2d at 756. This reasoning is equally applicable to the instant case. Here, the Superior Court essentially imposed a requirement that the mental health delegate seeking the warrant for emergency examination independently investigate and verify the information on which he is basing the application. Requiring mental health delegates for emergency services to investigate the veracity of each statement made to them prior to the filing of the application for a warrant, however, makes little sense. *See In the Matter of J.S.,* 142 Pa.Commw. 493, 499, 597 A.2d 750, 752 (1991) (common sense must be applied in construing provisions of MHPA); *Uram,* 130 Pa.Commw. at 154, 567 A.2d at 756. Such a requirement would only serve to frustrate the very purpose of the emergency evaluation and treatment sections of the MHPA, which is to render immediate assistance to those persons who are in need. When agencies are given information that someone is in need of immediate treatment, they must, within reason, be able to act on that information. In recognition of this necessity, the legislature has enacted section 7302, which states that agencies may act in such an emergency situation when they have "reasonable grounds" to do so.[10]

10. In addition to arguing that Mr. Morrison improperly failed to verify the information regarding Appellee's mental health, Appellee also complains that the statements relied upon by Mr. Morrison were hearsay. Appellee argues that hearsay statements cannot be used to support a finding of reasonable grounds for a section 7302 warrant. We disagree. Hearsay is admissible at the informal hearing required for an application for extended involuntary emergency treatment not to exceed twenty days. *See* 50 P.S. § 7303(c); *In re Hutchinson,* 500 Pa. 152, 159 n. 8, 454 A.2d 1008, 1011 n. 8 (1982) (legislature has determined that commitments for less than 20 days do not require same formalities as are necessary in commitments for longer periods of time). It seems clear that if the legislature provided that hearsay statements could be

■ In light of the clear statutory language of section 7302 and the differing policies behind criminal proceedings and proceedings for involuntary mental health treatment, we find that the Superior Court erred in holding that the validity of warrants obtained pursuant to section 7302 of the MHPA should be judged by the same standards applicable to criminal warrants. The probable cause inquiry required in the criminal warrant context is simply not appropriate in cases where a warrant for an emergency mental health evaluation has been obtained. At the same time, there is no blanket requirement, as indicated by the Superior Court, that information be verified by outside sources before a section 7302 warrant can properly be issued. Rather, as reflected by the explicit language of the MHPA, the standard for evaluating the validity of section 7302 warrants is whether reasonable grounds exist to believe that a person is severely mentally disabled and in need of immediate treatment.

■ The reasonable grounds standard is clearly less exacting than the probable cause standard. *Accord Commonwealth, Pa. Dep't of Transportation v. Johnson,* 102 Pa. Commw. 302, 304, 518 A.2d 8, 10 (1986) (reasonable grounds is less stringent standard than probable cause and is not very demanding).[11] Whether evidence is sufficient to constitute reasonable grounds for purposes of a section 7302 warrant can only be determined on a case by case basis. *Accord id.; Gasper v. Commonwealth, Pa. Dep't of Transportation,* 674 A.2d 1200, 1202 (Pa.Commw.1996) (whether reasonable grounds exist is a question of law reviewable on a case by case basis). We find, however, that the guiding inquiry must be

considered in the determination of whether involuntary treatment should be extended to up to twenty days, the legislature did not intend to exclude consideration of hearsay from an application for a warrant to take a person to a doctor for an emergency mental health evaluation. *See also Uram, supra* (section 7302 warrant based on nurse's call to mental health agency, relaying plaintiff's threats of suicide that plaintiff had made to nurse over telephone, was valid).

11. For purposes of more clearly delineating the reasonable grounds standard for section 7302 warrants, we find it appropriate to borrow principles expressed in case law addressing the reasonable grounds standard in other contexts.

whether, when viewing the surrounding facts and circumstances, a reasonable person in the position of the applicant for a section 7302 warrant could have concluded that an individual was severely mentally disabled and in need of immediate treatment. *Accord Commonwealth v. Stair,* 548 Pa. 596, 604 n. 6, 699 A.2d 1250, 1254 n. 6 (1997) (opinion in support of affirmance) (for purposes of driver license suspension cases, established test for reasonable grounds is whether a person in the position of the officer, viewing the totality of the facts and circumstances, could have reasonably concluded that the motorist was operating vehicle while under the influence). Reasonable grounds can be based on information received from third parties. *Gasper,* 674 A.2d at 1202 (citing *Patterson v. Commonwealth,* 138 Pa.Cmwlth. 292, 587 A.2d 897 (1991) (police officer's reasonable grounds to believe motorist was operating vehicle while under the influence of alcohol can be based on information received from a third party)). For reasonable grounds to exist, the applicant need not be correct in his belief that the individual was severely mentally disabled and in need of immediate treatment. *Accord Commonwealth, Pa. Dep't of Transportation v. Bird,* 134 Pa.Commw. 305, 578 A.2d 1345 (1990) (reasonable grounds does not require officer to be correct in belief that a motorist had been operating vehicle while under influence). In short, the question becomes whether the applicant of a section 7302 warrant possessed sufficient information upon which to base a reasonable determination that a person was severely mentally disabled and in need of emergency treatment.

Applying these principles to the instant case, the record compels the conclusion that Mr. Morrison had reasonable grounds to believe Appellee was mentally disabled and in need of immediate treatment, as required for a warrant to be issued pursuant to section 7302. Mr. Morrison, Supervisor of the agency designated by the County Administrator to handle emergency services under the MHPA, testified that he received information from a number of offices, including the F.B.I. and the Attorney General's office, that Appellee had repeatedly been calling them. He also received information

from members of Appellee's family, who expressed their concerns regarding Appellee's mental health. These concerns prompted the family members to inform Mr. Morrison that there was a gun inside Appellee's home. After receiving this information, Mr. Morrison made an initial visit to Appellee's home. During that first visit, Mr. Morrison observed that Appellee was guarded, disheveled and had a contusion on her eye which she declined to explain. He observed that Appellee refused to discuss the purpose of his visit and instead, closed the blinds and locked the door. She insisted that she was a federally protected witness and could only speak to the F.B.I. These observations led Mr. Morrison to believe that Appellee was acting paranoid and delusional.[12]

Given the reports from others and his own observations of Appellee, we find that Mr. Morrison, even before learning that Appellee had threatened to shoot herself and her son while holding a loaded gun, possessed sufficient information on which to base a reasonable conclusion that Appellee was mentally disabled and in need of emergency treatment.[13] This

12. We also take issue with the Superior Court's determination that Mr. Morrison lacked the qualifications to assess Appellee's condition for purposes of whether an involuntary mental health examination was warranted under section 7302. Mr. Morrison is a crisis service unit worker and the Supervisor of the Emergency Service Unit of Chestnut Ridge Counseling Services, which the County Administrator had delegated to handle emergency services under the MHPA. As an authorized delegate of the County Administrator, Mr. Morrison testified that he is often called upon to investigate and evaluate information received from others regarding the mental health of a particular person. See N.T., 2/8/96, at 11. While Mr. Morrison is not a psychiatrist, the MHPA specifically allows physicians or other "responsible persons," such as mental health delegates, to petition for section 7302 warrants.

13. Clearly, threatening to shoot yourself and your son while holding a loaded gun is highly indicative of a person who is in immediate need of mental health treatment. However, citing criminal procedural requirements and Pa.R.Crim.P. 119(b), the Superior Court concluded that Mr. Morrison's amendment to the warrant application, which reflected the threats and loaded gun incident but was added after the warrant had been issued, could not be considered in determining whether the application alleged sufficient grounds to believe that Appellee was mentally disabled and in need of treatment. See Pa.R.Crim.P. 119(b) (no evidence other than affidavits before issuing authority may be considered in determining whether arrest warrant was issued upon showing of probable cause). We have already determined that criminal proce-

assessment was confirmed by a doctor's examination of Appellee, within two hours of bringing Appellee into custody, which concluded that Appellee was severely mentally disabled and in need of immediate treatment. The statutory standard of reasonable grounds, as provided for in section 7302, was met here. Accordingly, we find that Appellant properly issued a warrant, based on the application prepared by Mr. Morrison, for the emergency mental health evaluation of Appellee.

Even if Appellant had not properly issued a section 7302 warrant in the instant case, however, we find that Appellee was also properly taken into custody pursuant to section 7302(a)(2) of the MHPA.[14] This section provides:

(2) Emergency Examination Without a Warrant.—Upon personal observation of the conduct of a person constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment, a physician or peace officer, or anyone authorized by the county administrator may take such person to an approved facility for an emergency examination. Upon arrival, he shall make a written statement setting forth the grounds for believing the person to be in need of such examination.

50 P.S. § 7302(a)(2).

In finding that this section of the MHPA was inapplicable to the instant matter, the Superior Court focused on the "written statement" requirement and noted that although Mr. Morrison had added statements to the warrant after taking Appellee to

dural standards are inappropriate in the context of evaluating the validity of section 7302 warrants for emergency mental health evaluations. Nonetheless, we find that the section 7302 warrant here was properly issued on the basis of Mr. Morrison's application even before it included information that Appellee had threatened to shoot herself and her son and was discovered holding a loaded gun.

14. Mr. Morrison testified that, where possible, it is Fayette County's policy to routinely fill out an application and obtain a warrant pursuant to section 7302(a)(1), whether required or not. N.T ., 2/8/96, at 30–31. *See also* Memo from Fayette County Mental Health Mental Retardation Program to Superior Court, 8/26/96, at 2 (noting Fayette County's policy to routinely fill out the warrant page as a safeguard in assuring that needed paperwork is never omitted).

the hospital, these additions were insufficient to satisfy the statutory "written statement" requirement. We disagree.

Here, when Mr. Morrison attempted to serve the section 7302 warrant, Appellee refused to permit him or the police to enter the house. Once Mr. Morrison and the officers forcibly entered in response to Appellee's threats to shoot herself and her son, they found Appellee pointing a loaded gun at them. We have no difficulty concluding that this conduct, occurring in the presence of Mr. Morrison and the officers, constitutes reasonable grounds to believe that Appellee was mentally disabled and in need of immediate treatment. *See Janicsko v. Pellman,* 774 F.Supp. 331 (M.D.Pa.1991), *aff'd,* 970 F.2d 899 (3d Cir.1992) (where foster son informed police that plaintiff had threatened to kill her husband's mistress and to harm herself, and plaintiff locked herself in car, refusing to cooperate with police and eventually forcing police to break into plaintiff's car, police had adequate basis for taking plaintiff into custody pursuant to section 7302(a)(2) of the MHPA). While the majority of the Superior Court dismissed this dangerous behavior as self-defense given the forcible entry by Mr. Morrison and the police, we agree with Judge Hudock's statement in his dissent that "one could argue that such conduct was reasonable with regard to [the police and Mr. Morrison forcibly entering her home] but it cannot explain J.M.'s threat to shoot herself and her own son who was in the house with her." *In re J.M.,* 454 Pa.Super. at 292, 685 A.2d at 193 (Hudock, J., dissenting).

■ Once Appellee was disarmed and Mr. Morrison and the police were able to safely take Appellee into custody, Mr. Morrison documented these events in the warrant. Specifically, he wrote: "when serving the 302, [Appellee] threatened to shoot herself and her 23 year-old son and in fact, pointed a loaded automatic pistol at police and MH delegate. She is clearly a danger to herself and others." *In re J.M.,* 454 Pa.Super. at 284, 685 A.2d at 189. Unlike the Superior Court, we find that this written addition to the warrant constitutes a sufficient "written statement" for purposes of section 7302(a)(2) and therefore, that Appellee was also properly

taken into custody for the purposes of an emergency mental health evaluation pursuant to this section of the MHPA.[15]

The order of the Superior Court is reversed.

**15.** The Superior Court also sua sponte determined that Appellee's due process rights had been violated because the trial court ordered involuntary treatment, pursuant to 50 P.S. § 7303 and 50 P.S. § 7304, when no record of the hearings conducted by the MHRO had been produced. However, we agree with Appellant that since Appellee failed to raise this issue either before the trial court or the Superior Court, the issue had been waived and was therefore, not preserved for appellate review. *See* Pa. R.A.P. 302 (issues not raised in lower courts are waived); *Commonwealth v. Piper*, 458 Pa. 307, 311, 328 A.2d 845, 847 (1974) (matters not raised in lower court cannot be considered on appeal). Accordingly, it was improper for the Superior Court to raise and decide the issue sua sponte. *See Arthur v. Kuchar*, 546 Pa. 12, 682 A.2d 1250 (1996) (issues not preserved for appellate review may not be considered by an appellate court, even where the alleged error involves a basic or fundamental mistake, and thus, Superior Court erred in raising and deciding waived issue sua sponte).