J-S10043-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF: D.L.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.L.D. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1209 MDA 2020 |

Appeal from the Order Entered August 24, 2020
In the Court of Common Pleas of Centre County Civil Division at No(s):
18-2865

BEFORE:  MURRAY, J., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                          **FILED MAY 13, 2021**

D.L.D. appeals the order of the Court of Common Pleas of Centre County (trial court) which directed him to be committed to inpatient treatment for a period not to exceed 90 days.  Because the record supports one of the grounds for involuntary civil commitment in the Mental Health Procedures Act (MHPA) – that D.L.D. posed a clear and present danger to himself – we affirm.[1]

**I.**

On or around August 12, 2020, police responded to the home of D.L.D. in response to complaints from his roommates that he was behaving in an

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The MHPA authorizes the emergency involuntary commitment of persons who are "severely mentally disabled and in need of immediate treatment[.]" 50 P.S. § 7301(a).

erratic and dangerous manner. At the time, warrants had already been issued compelling D.L.D. to undergo psychiatric evaluation. When police arrived, D.L.D. was aggressive and non-cooperative – conduct similar to what he exhibited in recent visits that same month. D.L.D. was taken into custody and hospitalized in a treatment facility.

On August 18, 2020, the Centre County Mental Health/Intellectual Disabilities/Early Intervention and Drug & Alcohol Offices (the County) petitioned to have D.L.D. involuntarily committed to inpatient treatment. *See* 50 P.S. § 7303. That same day, a commitment hearing was held before a mental health review officer and five witnesses testified: Dr. Jeffrey Baker, Dr. Jason Rock, Erin Crown, William Strayer and D.L.D. *See* Hearing Transcript, 8/18/2020.

Following the hearing, on August 20, 2020, and at the recommendation of the mental health review officer, the trial court entered an order directing D.L.D. to be committed to inpatient treatment for no longer than 90 days. *See* 50 P.S. § 7304. D.L.D. filed a petition for review of certification for extended involuntary emergency treatment, and after the petition was denied, he timely appealed, raising one issue in his brief:

> Was there a lack of sufficient evidence presented at the Hearing to commit [D.L.D.] to involuntary psychiatric treatment, as there was not clear and convincing evidence that [D.L.D.] was severely mentally disabled such that he posed a clear and present danger of harm to himself and others; namely, whether there was a reasonable probability of death, serious bodily injury, or serious physical debilitation within 30 days unless [D.L.D.] was forced to undergo treatment, or that [D.L.D.] posed a clear and present

- 2 -

danger to others such that within the past 30 days [D.L.D.] had inflicted or attempted to inflict serious bodily harm on another and that there was a reasonable probability that such conduct would be repeated?

Appellant's Brief, at 4.[2]

## II.

D.L.D. now argues that the trial court erred in ordering his involuntary commitment because the evidence needed to justify such an order is legally insufficient to satisfy any of the standards outlined in 50 P.S. § 7301(b) of the MHPA.[3] His position is that while some of his behavior was odd, it did not rise to the level of a clear and present danger of imminent bodily harm to himself, as the MHPA requires in order for him to be involuntarily committed.

The County has conceded in its brief that the record does not support a finding that D.L.D. posed a clear and present danger to *others* under the standard outlined in Section 7301(b)(1) of the statute. However, the County

_____

[2] We note that the lapsing of the 90-day commitment period from August 20, 2020, does not make this appeal moot. *See e.g., In re J.M.*, 726 A.2d 1041, 1045 n.6 (Pa. 1999) (appeals from expired involuntary commitment orders are not moot as appellate issues are capable of repetition and may evade review).

[3] As mandated by 50 P.S. § 7304(c), we will examine the record to determine whether "there is evidence . . . to justify the hearing court's findings. *Coin. ex rel. Gibson v. DiGiacinto*, 439 A.2d 105, 107 (Pa. 1981). This examination requires the reviewing court to take "the record in the light most favorable to the verdict winner." *In re: Vencil*, 152 A.3d 236, 243 (Pa. 2017). The liberty interests at stake in challenges to involuntary commitment require that we strictly interpret and adhere to statutory requirements. *See Commonwealth v. Hubert*, 430 A.2d 1160, 1163 (Pa. 1981).

contends that the record does support the finding that he posed a clear and present danger to *himself* under the standard set forth in Section 7301(b)(2)(i).

The latter statute provides that a clear and present danger can be shown if:

> the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that **there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act**.

50 P.S. § 7301(b)(2)(i) (emphasis added).

In this case, the trial court held a hearing regarding D.L.D.'s mental health. Each of the testifying witnesses had taken part in D.L.D.'s psychological evaluation within the 30 days preceding the County's petition for an order of involuntary commitment. All of the witnesses observed in their respective capacities a rapid decline in D.L.D.'s mental health, leading to the conclusion that he required emergency medical treatment.

Dr. Jeffrey Baker testified that he met with D.L.D. twice in the past month and that within that span, D.L.D. had become considerably less stable. ***See*** Hearing Transcript, 8/18/2020, at pp. 16-17. In Dr. Baker's opinion, albeit based on his limited interactions, D.L.D. was not fit to make decisions necessary to protect himself from physical harm.

A psychiatric physician's assistant, Erin Crown, also saw D.L.D. on two occasions to help manage his medications, with the last visit being on July 24, 2020. She testified that D.L.D. had been diagnosed as a schizophrenic, but that he often had been unwilling or unable to participate in treatment or show up for scheduled appointments. Crown also recounted being in contact with the police and discussing D.L.D.'s erratic and paranoid behavior, such as sending hundreds of fax messages to the police station. *Id*. at p. 55.

Dr. Jason Rock, a psychiatrist, testified that he had not personally been able to evaluate D.L.D., but he reviewed the written evaluations of Erin Crown and William Strayer, the Centre County Mental Health case manager who signed the petition for involuntary commitment. Relying on this information, Dr. Rock determined that D.L.D. had been noncompliant with outpatient treatment for an active psychotic disorder (schizophrenia), posing a danger to the health, safety and well-being of himself and others. *Id*. at pp. 43-45, 49. In Dr. Rock's opinion, D.L.D. was best served by inpatient treatment which would be the least restrictive alternative to provide adequate treatment. *Id*.

Strayer also testified at the hearing and gave perhaps the most specific account of D.L.D.'s behavior in the days before his most recent arrest. Strayer emphasized that D.L.D. had been keeping the doors open at his apartment, leaving all the burners of the stove on and leaving the water facets running. D.L.D. had also been going off his psychiatric medications and generally presenting as unstable and disorganized.

It was also undisputed that the police had been called to D.L.D.'s apartment multiple times within the previous weeks of the hearing due to the above described behavior, as well as other strange outbursts, such as scaring his roommates by jumping out at them while wearing a ski mask.

Finally, D.L.D. testified at the hearing on his own behalf. His comments were generally incoherent or irrelevant. His main contention was that he did not pose a danger to anyone and that there had been no evidence that he had physically threatened harm against himself or others.[4]

Taken together, the evidence supports the trial court's conclusion that D.L.D. would be unable, without care, supervision and the continued assistance of others, to satisfy his needs. There were no overt threats of imminent violence that D.L.D. directed toward himself, but he exhibited behavior showing a rapid decline in his mental faculties and a marked trend toward likely self-harm. Several witnesses testified to that effect, and the undisputed facts bear it out – especially D.L.D.'s extremely dangerous act of leaving the stove burners on in his apartment.[5]

---

[4] It should be noted, too, that throughout the hearing, D.L.D. made frequent and incoherent interruptions during other witness' testimony. This further supports the conclusion that D.L.D. requires help to keep his impulses in check.

[5] Under 50 P.S. § 7301(b)(2)(i), no overt threat of physical harm is needed to justify involuntary commitment. *See generally In re S.B.*, 777 A.2d 454 (Pa. Super. 2000).

Based on the clear and convincing evidence, the trial court did not err in concluding that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment was provided to D.L.D. The commitment order, therefore, satisfies the requirements of 50 P.S. § 7301(b)(2)(i), and the trial court's order must stand. *See In re T.T.*, 875 A.2d 1123 (Pa. Super. 2005) (affirming order of involuntary commitment where appellant's mental condition was contributing to progressive physical debilitation).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/13/2021