COMMONWEALTH of Pennsylvania, Appellee

v.

**John Thomas JACKSON, III, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 7, 2013.
Filed Feb. 21, 2013.

Jeffrey W. Miller, Johnstown and James R. Silvis, Greensburg, for appellant.

Christiann O. Flanigan, Assistant District Attorney, Greensburg, for Commonwealth, appellee.

BEFORE: FORD ELLIOTT, P.J.E., BOWES, & DONOHUE, JJ.

OPINION BY BOWES, J.:

John Thomas Jackson, III appeals from the April 5, 2012 judgment of sentence of an aggregate period of five years incarceration [1] imposed following his conviction at a non-jury trial of manufacture of a controlled substance, possession with intent to deliver, possession, all involving marijuana, and possession of drug paraphernalia. He alleges that the trial court erred in denying his motion to suppress evidence that was obtained pursuant to a search warrant secured with information gleaned while police officers were attempting to serve a mental health warrant pursuant to the Mental Health Procedures Act ("MHPA"), 50 P.S. § 7301, *et seq.* After careful review, we affirm.

The trial court summarized the relevant facts:

The charges in this matter arose when, on April 5, 2011, Officer Robert James Shapiro of the Ligonier Township Police Department was asked to serve a "signed 302 warrant"[ [2]] that had been issued for the defendant. Officer Shapiro was advised by Jackson's paramour, Katie Bates, that Jackson "would not go cooperatively with the police," and that he was known to carry a weapon. Jackson's propensity for violence was apparently also documented in the mental health warrant. Officer Shapiro, assisted by other officers and accompanied by Bates, went to Jackson's residence and "attempted to gain entry and speak with Mr. Jackson." When they received no response to their knocks, Katie Bates provided the officer with a key to the residence and Officer Shapiro opened the door. Immediately upon entering the residence, Officer Shapiro smelled the pungent odor of marijuana. As the officers searched the residence for Jackson, the officers observed items of drug paraphernalia in plain view. They finally encountered a locked room, and again announced themselves and asked Jackson to come out of the room. Bates had told the officers that Jackson had to be in the house, because he had no car and nowhere to go; therefore, the officers believed that Jackson was barricaded inside the room, and based upon the information received earlier, believed that Jackson could pose a danger to the officers or to himself. Upon entering the room, which appeared to be the master bedroom, officers saw additional items of drug paraphernalia and discovered an active marijuana growing operation. Jackson was not present at the residence. Officer Shapiro notified other officers and agencies regarding the marijuana grow, a search warrant was obtained for a further search of the residence and the contraband was seized.

Trial Court Opinion, 8/13/12, at 2–3 (citations to record and footnotes omitted).

Appellant filed an omnibus pretrial motion seeking, *inter alia,* to suppress the contraband seized pursuant to the search warrant on the ground that it was derivative of an invalid mental health warrant which the police used to gain entry to his home. A hearing devoted to the suppression issues was held on October 11, 2011. At that time, Appellant's father, John Jackson, verified that his son lived at 1101 Gravel Road with Katie Bates and the couple's children. N.T. Suppression,

---

1. Due to application of a mandatory minimum, Appellant's minimum and maximum sentences coincided.

2. A "302 warrant" is a shorthand reference to an emergency mental health warrant authorized by 50 P.S. § 7302.

10/11/11, at 6. Mr. Jackson recounted how Ms. Bates and the children came to his residence on April 4, 2011, that Police Officer Sandy Oslosky joined them, and that there was a conversation about Appellant's behavior and obtaining a 302 warrant. *Id.* at 7. The next day, Ms. Bates advised him of her intention to obtain such a warrant, and Mr. Jackson drove her to Westmoreland Case Management in Latrobe for that purpose. *Id.* at 11. Upon receipt of the required paperwork, they proceeded to the Ligonier Township police station. Mr. Jackson testified that it was his understanding that the police would speak to his son and then take him to the hospital. *Id.* at 12. He never saw the warrant, and he did not have firsthand knowledge of the facts recited therein. *Id.* at 16.

Tracy Semow, a mental health supervisor for Westmoreland Case Management and Supports, testified that in addition to her caseload supervision responsibilities, she assists individuals who have a family member or friend who is a threat to himself or others. *Id.* at 18. On April 5, 2011, she met with Mr. Jackson and his wife and Ms. Bates, and all three expressed concerns about Appellant's and Ms. Bates's safety. Since Ms. Bates was the primary witness to Appellant's conduct and felt personally threatened, she was the designated applicant. *Id.* at 23. Ms. Semow assisted Ms. Bates in completing an application for the warrant that subjected Appellant to an involuntary emergency examination and treatment.

Ms. Bates averred in the application that she believed Appellant to be severely mentally disabled and a clear and present danger to others. She checked the box on the form providing:

> Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is reasonable probability that such conduct will be repeated. A clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm,

Application for Involuntary Emergency Examination and Treatment, Commonwealth Exhibit 1, at 2.

Ms. Bates handwrote the behavior exhibited by Appellant within the past thirty days that supported her belief. Ms. Bates recounted that on March 21, 2011, she and Appellant had an explosive argument over trash bags that culminated in Appellant threatening "to smash [her] face in with those f——in keys." *Id.* at 3. Ms. Bates also described an incident that occurred on April 4, 2011, the day before the warrant issued. Ms. Bates insisted on driving home from the dentist after Appellant had received novocaine. Their two children were in the rear seat of the vehicle. Appellant repeatedly yelled at her about her driving and started kicking the dashboard and punching the window to convince her that he should drive. When Ms. Bates declined to relinquish control of the car, Appellant told her "No you are going to f——ing pull over now and let me drive!" *Id.* at 8 (emphasis omitted). When Ms. Bates refused, Appellant pushed his feet against the dashboard, which had the effect of pushing his seat into the infant seat located behind him. When Ms. Bates pointed out that the child could be hurt, Appellant put his hand on the keys in the ignition, threatening to remove them.

When Ms. Bates continued to refuse to allow Appellant to drive, he began punching the window on the passenger side of the vehicle. He again insisted that she turn over the wheel, and when she declined, he threatened, "I will beat your

face in with a baton until there is a big gaping hole in your head!" *Id.*

At that point, Ms. Bates directed the car away from their home, intending to go directly to the police station. Appellant noticed and became more violent. As Ms. Bates was entering a turn, Appellant grabbed the keys in the ignition and turned off the car, blocking traffic in all directions. He then jumped from the car and ordered her to exit the car. Ms. Bates restarted the car and attempted to drive it. Appellant stood in front of the car, took his baton, and smashed it against the passenger side window. At that point, Ms. Bates proceeded to the local police department where she filed a report of the incident.

Ms. Semow read the application in its entirety over the phone to Dawn Hixon, a Westmoreland County mental health delegate. Based on Ms. Bates' account, Ms. Hixon approved the warrant that permitted the police to apprehend Appellant and take him to the nearest emergency room for evaluation. N.T., 10/11/2011, at 25. Ms. Semow then signed the warrant. At the suppression hearing, Ms. Semow verified her signature on the 302 warrant and confirmed that the information contained therein was the information Ms. Bates transcribed in Ms. Semow's presence. *Id.* at 26–27.

Police Officer Robert J. Shapiro testified that shortly after his 3:00 to 11:00 p.m. shift started, he met with Ms. Bates. She had Appellant's 302 warrant, which the officer reviewed. He questioned Ms. Bates about the contents of the warrant. Ms. Bates apprised him that Appellant should be at their home, that he had no vehicle, and that he would not go willingly with police. She also warned the officer that Appellant carried a pocketknife and collapsible baton on his person.

The officer obtained a picture of Appellant from a database containing his driver's license and obtained more police for assistance. Based on the behavior documented in the warrant, Officer Shapiro anticipated that any confrontation would be physical. *Id.* at 39. The officer told Ms. Bates that her assistance was required at the house because, if the police were unable to gain access, she would need to open the door for them. *Id.* at 40.

Officer Shapiro recounted how Ms. Bates provided her key to permit police access to Appellant's residence. He described how, immediately upon entry, he smelled marijuana. While surveilling the first floor, Officer Shapiro observed drug paraphernalia and marijuana magazines. They proceeded up the steps to the second floor landing, encountering a locked door. Again, the officer knocked and announced himself, but no one responded. Thinking Appellant had barricaded himself within the room, he directed a fellow officer to go downstairs and ascertain if Ms. Bates had a key to the room. Ms. Bates informed the officers that she did not have a key for that upstairs suite of rooms and handed her lanyard to the officers. Officer Shapiro tried all of the keys, but none would unlock the door.

Police used a pocketknife to slide the bolt of the door to the open position. In the bedroom and the bathroom, they observed approximately fifty marijuana plants, leaves, and branches, grow tents, grow lights, tanks of carbon dioxide, and additional drug paraphernalia. They secured the premises and took steps to procure a search warrant. Officer Shapiro also testified that the next day, Appellant's ex-wife informed the police that he had committed himself to the mental health clinic. *Id.* at 53.

The suppression court found the testimony of the Commonwealth's witnesses to

be credible and held that the application provided a sufficient basis for the 302 warrant to issue. The court ruled that the police acted appropriately in searching for Appellant and that the officer's belief that Appellant was barricaded inside the house was reasonable. *Id.* at 65. The motion to suppress was denied.

A nonjury trial commenced on April 5, 2012. At its conclusion, the trial court found Appellant guilty of all charges. Appellant waived a pre-sentence report and the court proceeded immediately to sentencing. Trial counsel thereafter withdrew, and the trial court appointed new counsel for purposes of the appeal.

Appellant filed this appeal on April 27, 2012, and complied with the trial court order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court authored its Rule 1925(a) opinion, and the matter is ripe for our review. Appellant's sole issue is, "When the Defendant makes threats of harm without taking any steps in furtherance of that threat or causing actual serious bodily harm on another, has the 'clear and present danger' standard under 50 P.S. § 7301 been met?" Appellant's brief at 3.

The thrust of Appellant's argument is that the affidavit upon which the 302 warrant was based was legally insufficient under 50 P.S. § 7301 of the MHPA, rendering the ensuing police conduct infirm. He continues that, since it was during the execution of this invalid warrant that police officers observed the controlled substances for which the search warrant subsequently issued, the fruits of the illegal search should have been suppressed.[3]

The law is well settled that the Commonwealth has the burden at a suppression hearing of establishing "by a preponderance of the evidence that the evidence was properly obtained." *Commonwealth v. Galendez,* 27 A.3d 1042, 1046 (Pa.Super.2011) (*en banc*) (quoting *Commonwealth v. Culp,* 378 Pa.Super. 213, 548 A.2d 578, 581 (1988)). Our scope and standard of review of a suppression order are also established. Where the Commonwealth prevailed on the issue before the trial court, we "may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *Commonwealth v. Boczkowski,* 577 Pa. 421, 846 A.2d 75, 89 (2004). If the record supports the trial court's factual findings, this Court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Id.; see also Commonwealth v. Emmil,* 866 A.2d 420, 421–22 (Pa.Super.2005).

The MHPA provides in pertinent part that

> Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

50 P.S. § 7301(a). A clear and present danger to others "shall be shown by establishing that within the past 30 days the

---

**3.** Appellant does not assert any challenge to the manner in which the 302 warrant was executed by police.

person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated." 50 P.S. § 7301(b). "[P]roof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm" is sufficient to satisfy this burden. *Id.*

At the suppression hearing, the Commonwealth presented evidence establishing that Ms. Hixon had the power to authorize Ms. Semow to sign the 302 warrant and that the facts and circumstances made known to her were those contained in the application for the warrant. The trial court found the testimony of the Commonwealth's witnesses to be credible and concluded, based upon review of Commonwealth Exhibit 1, the Application, that there was a sufficient basis for issuance of the warrant.

■ Appellant maintains that since the application contained no allegations that Appellant was a threat to himself, or that he inflicted serious bodily injury, allegations of threats accompanied by acts in furtherance of those threats were necessary in order to meet the clear and present danger requirement of the statute. 50 P.S. § 7301(b)(1). He contends that while the application recited threats of violence, there was no allegation of any overt act undertaken by Appellant to carry out the threats.

■ The leading case on the sufficiency of a 302 warrant is *In re J.M.*, 556 Pa. 63, 726 A.2d 1041 (1999). Our Supreme Court held therein that the standard for evaluating the validity of such documents is whether reasonable grounds exist to believe that a person is severely mentally disabled and in need of immediate treatment, a standard that is "clearly less exacting than the probable cause standard." *Id.* at 1049. Such a warrant may be based

upon hearsay "in light of the emergency nature, therapeutic purpose and short duration" of a section 302 commitment. *Id.* at 1046–47 n. 9. The "guiding inquiry" is whether, "when viewing the surrounding facts and circumstances, a reasonable person in the position of the applicant for a section 7302 warrant could have concluded that an individual was severely mentally disabled and in need of immediate treatment." *Id.*

The issue of whether allegations in an application were sufficient to establish an act in furtherance of a threat to commit harm was addressed by this Court in *In re R.D.*, 739 A.2d 548, 555 (Pa.Super.1999). We held therein that an elderly woman's act of picking up her cane in an effort to hit another, together with verbal threats of harm, constituted an "act in furtherance of the threat to commit harm," as contemplated by the statute.

In *In re Woodside*, 699 A.2d 1293 (Pa.Super.1997), a man argued that his initial involuntary commitment was improper because the petition filed by his estranged wife failed to allege a threat and acts in furtherance of the threat. He claimed first that his statement to another that he "might as well get a scope and a rifle and get rid of the problem, my soon-to-be-ex-wife," did not constitute a threat. *Id.* at 1296. We rejected that argument. The question remaining was whether there was an overt act in furtherance of the threat. We held that the man's purchase of a scope from a sporting goods store on the day of his commitment constituted an overt act in furtherance of the threat.

In this case, Appellant avers that Ms. Bates's account of the altercation in the car was insufficient to obtain a warrant. According to Appellant, the fact that he was outside the car when he struck the passenger side window with his baton,

rather than the driver's side window, was an indication that "he did not intend to carry out his threat" of harming Ms. Bates. Appellant's brief at 10.

Appellant's attempt to understate his physically violent conduct is unavailing. We are not persuaded that the fact that he smashed the passenger side window with his baton diminished his threat to use the collapsible baton that he carried on his person to severely injure Ms. Bates. The mere act of removing the weapon from his person can be viewed as an overt act in furtherance of his verbal threat. Furthermore, as *Woodside* illustrates, the overt act requirement does not require proximity or the immediate ability to carry out the threat. A step taken in furtherance of the threat is sufficient.

The Commonwealth points to other numerous physical acts, in addition to the smashing of the car window, that Appellant perpetrated in furtherance of his threats. The application recounted Appellant kicking the dashboard, punching the car window, pushing his feet against the dashboard and thrusting his seat back into his child's infant seat behind him, and his act of turning off the car ignition while in traffic. Commonwealth's brief at 10. We agree with the Commonwealth that the application contained sufficient averments of overt acts made in furtherance of his verbal threats to satisfy the statute.

■ After a thorough review of the record, we concur with the suppression court's finding that the 302 warrant properly issued based on the facts recited in the application. For the reasons stated, we conclude that the officers were lawfully present in Appellant's home when they observed controlled substances in plain view and those observations supported the issuance of the search warrant for Appellant's premises. Hence, the items seized were legally obtained and admissible as evidence against Appellant.

Judgment of sentence affirmed.