J-A01017-15

2015 PA Super 81

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| SAMANTHA FLEET, | : | |
| | : | |
| Appellant | : | No. 29 WDA 2014 |

Appeal from the Judgment of Sentence November 15, 2013,
Court of Common Pleas, Allegheny County,
Criminal Division at No. CP-02-CR-0008782-2013

BEFORE:  FORD ELLIOTT, P.J.E., DONOHUE and ALLEN, JJ.

OPINION BY DONOHUE, J.:                              **FILED APRIL 16, 2015**

Samantha Fleet ("Fleet") appeals from the November 15, 2013 judgment of sentence entered by the Allegheny County Court of Common Pleas following her conviction of possession of a controlled substance.[1] Specifically, Fleet challenges the trial court's denial of her motion to suppress, as the fruit of an unlawful search, the heroin and needle found during the execution by police of a warrant for emergency mental health treatment ("302 warrant").  Upon review, we conclude that because the Commonwealth failed to satisfy its burden of proof regarding the propriety of the issuance of the 302 warrant, the trial court erred by denying suppression.  As Fleet's conviction was based solely upon the evidence

---

[1]  35 P.S. § 780-113(a)(16).

obtained during the execution of the 302 warrant, we vacate the judgment of sentence.

The trial court aptly summarized the facts and procedural history of this case as follows:

> On December 14, 2012, Crafton Borough Police Officer Stephanie Newcomer was on duty between 3:00 p.m. and 11:00 p.m. (T.T.) at 4. On that day, Jennifer Fleet, [Fleet]'s mother, entered the Crafton Borough Police station regarding text messages [Fleet] sent stating that [Fleet] wanted to kill herself. (T.T.) at 5. Jennifer Fleet showed the text messages to Officer Newcomer. (T.T.) at 5. Jennifer Fleet also told Officer Newcomer that she had conversations with [Fleet] wherein [Fleet] stated that she was depressed and wanted to end things. (T.T.) at 5-6. Upon hearing this information, Officer Newcomer telephoned Rita Agostinelli at the Allegheny County Mental Health Department (the "ACMHD") and advised her of the situation. (T.T.) at 6, 11.
>
> Telephoning the ACMHD is an established procedure in the Crafton Borough Police Department and one with which Officer Newcomer was familiar. (T.T.) at 18. Officer Newcomer had encountered warrants and involuntary commitments under the Mental Health Procedures Act ("MHPA"), 50 P.S. § 7302[,] before this incident. (T.T.) at 18. Jennifer Fleet stated that she would sign a [302] warrant to commit [Fleet]. (T.T.) at 6. Jennifer Fleet read the text messages to Ms. Agostinelli and went into more detail on the telephone. (T.T.) at 16. Ms. Agostinelli instructed Officer Newcomer to tell Jennifer Fleet to follow [Fleet] to the hospital to conclude the paperwork. (T.T.) at 17. At this point, Ms. Agostinelli gave Officer Newcomer verbal authorization over the phone that the [302] warrant would be filed. (T.T.) at 6. Ms. Agostinelli advised Officer Newcomer that as long as Jennifer Fleet followed the ambulance that would be taking [Fleet] to the hospital, she would

sign the paperwork that would complete the warrant and commitment. (T.T.) at 7. It is not the Crafton Police Department's policy to require a paper warrant; a verbal warrant such as the one in this matter is sufficient. (T.T.) at 10-11. Officer Newcomer understood that the ACMHD would fax the [302] warrant to the hospital, and that the hospital filled out and finalized the requisite paperwork. (T.T.) at 11-12.

Jennifer Fleet followed Officer Newcomer and the ambulance to [Fleet]'s brother's house wherein [Fleet] was located. (T.T.) at 7-8, 17. [Fleet] was asked to come outside of her brother's home, and was advised of the [302] warrant. (T.T.) at 8, 19. Officer Newcomer asked [Fleet] if she wanted to step inside, because a search was required prior to transportation pursuant to a warrant. (T.T.) at 8, 19. Per Officer Newcomer, a search of the person is required pursuant to a warrant in such a situation for the safety of the police and the ambulance crew. (T.T.) at 9. They went inside and Officer Newcomer asked [Fleet] if she had anything on her. (T.T.) at 8, 19. [Fleet] informed Officer Newcomer that she had heroin on her, and handed the officer a capped syringe and five "stamp bags." (T.T.) at 9. A stamp bag is a small square white bag with suspected heroin in it. (T.T.) at 9. [Fleet] had four empty stamp bags and one stamp bag had 0.1 grams of heroin in it. (T.T.) at 17-18. Laboratory results confirmed that the substance inside the stamp bag was heroin. (T.T.) at 40.

On November 14, 2013, this [c]ourt held a suppression hearing on two issues prior to [Fleet]'s non-jury trial, also before this [c]ourt. [Fleet] argued that the search was illegal; that the search, if legal, exceeded the scope of permissible searches; and that the Commonwealth has a burden to show that they've complied with all the procedural safeguards pertaining to searches. (T.T.) at 25. This [c]ourt denied [Fleet]'s suppression motion. (T.T.) at 35.

Following that denial, this [c]ourt proceeded to a stipulated non-jury trial incorporating the testimony from the suppression hearing. (T.T.) at 37. The parties stipulated to the laboratory results and that Officer Newcomer would testify that, based on her training and experience, she perceived the needle to be drug paraphernalia used for the ingestion of heroin. (T.T.) at 40. In consideration of the testimony and stipulated evidence, this [c]ourt found [Fleet] guilty of the possession charge at [c]ount [o]ne and not guilty of the paraphernalia charge at [c]ount [t]wo. At [c]ount [o]ne, this [c]ourt sentenced [Fleet] to six months of non-reporting probation and a [d]rug and [a]lcohol [e]valuation. (T.T.) at 45.

Trial Court Opinion, 5/12/14, at 4-6.

On November 25, 2013, Fleet filed a timely post-sentence motion seeking reconsideration of the trial court's denial of her suppression motion. The trial court denied this request on December 4, 2013. On January 2, 2014, Fleet filed her notice of appeal and now presents the following arguments before this Court:

I.    Whether the [t]rial [c]ourt erred in failing to grant Ms. Fleet's *Omnibus* Pre-Trial Motion to Suppress Evidence when the Commonwealth failed to establish that the procedural safeguards and requirements of involuntary civil commitment were satisfied?

II.   Assuming, *arguendo*, the Commonwealth established that the procedural safeguards and requirements of involuntary civil commitment were satisfied, whether the [t]rial [c]ourt nonetheless erred in failing to grant Ms. Fleet's *Omnibus* Pre-Trial Motion to Suppress Evidence when the search of Ms. Fleet's person was not supported by a search warrant, and no specifically established, well-delineated exception to the warrant requirement existed?

- 4 -

III.     Assuming, *arguendo*, the police may conduct a warrantless search of a person incident to a lawful involuntary civil commitment, whether the [t]rial [c]ourt still erred in failing to grant Ms. Fleet's *Omnibus* Pre-Trial Motion to Suppress Evidence when the police exceeded the permissible scope of such a search?

Fleet's Brief at 4.[2]

We review the trial court's denial of a motion to suppress to determine whether the record supports the trial court's factual findings and whether it reached its legal conclusions in error. **Commonwealth v. Enick**, 70 A.3d 843, 845 (Pa. Super. 2013), *appeal denied*, 85 A.3d 482 (Pa. 2014). "If the record supports the trial court's findings of fact, we will reverse only if the trial court's legal conclusions are incorrect." **Id.** (citation omitted).

Both the United States and Pennsylvania Constitutions protect citizens from unreasonable searches and seizures. **See** U.S. CONST. amend. IV; PA. CONST. art. I, § 8. The trial court states, however, that because police obtained the contraband while executing a 302 warrant, "the proper inquiry is not under the criminal standards of the Fourth Amendment to the U.S. Constitution and Article [I], Section 8 of the Pennsylvania Constitution." Trial Court Opinion, 5/12/14, at 7. Rather, according to the trial court, the Commonwealth need only "establish that the procedural safeguards and

---

[2]  Since we conclude that the Commonwealth failed to satisfy its burden of proof with regard to the propriety of the issuance of the 302 warrant, we do not address the remaining issues Fleet raises on appeal.

requirements of involuntary civil commitment were satisfied" under the MHPA. *Id.* at 7, 11. As the trial court found that the Commonwealth satisfied its burden of proving that the issuance of the 302 warrant was proper pursuant to the MHPA, it found that the evidence was not subject to suppression. *Id.* at 8-10.

Fleet asserts that the trial court's conclusions in both respects are erroneous. First, Fleet disagrees with the trial court's conclusion that involuntary civil commitments are not subject to the protections of the Fourth Amendment and Article I, Section 8. Fleet's Brief at 14-18. Fleet further argues that the Commonwealth did not present sufficient evidence to support a finding that the issuance of a 302 warrant was proper, as it failed to present evidence to show that Fleet was a "clear and present danger" under the MHPA or demonstrate compliance with the MHPA's warrant requirement. *Id.* at 21-23.

At the outset, we find no support for the trial court's notion that persons subjected to involuntary civil commitments are not entitled to the constitutional protections provided by the Fourth Amendment and Article I, Section 8. The trial court is correct that civil commitment proceedings are not "to be based on criminal standards and procedures." *In re J.M.*, 726 A.2d 1041, 1046 (Pa. 1999); *see* Trial Court Opinion, 5/12/14, at 7. This relates solely to the burden of proof required at an involuntary civil commitment proceeding, and does not mean that simply because the person

is subject to a 302 warrant he or she therefore is not afforded constitutional protection against unreasonable searches and seizures by police. These protections apply to all citizens, regardless of their status, when police or other government entities are involved. *See* U.S. CONST. amend. IV ("The right of **the people** to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); PA. CONST. art. I, § 8 ("**The people** shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.") (emphasis added); *see also Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 67 (1992) ("the [Fourth] Amendment's protection applies in the civil context as well [as the criminal context]").

It is an intrusion by the government, not the status of the citizen, that triggers protection and inquiry into the reasonableness of the intrusion. "The Fourth Amendment and Article I, § 8 have long been interpreted to protect the people from unreasonable government intrusions into their privacy. The reasonableness of a governmental intrusion varies with the degree of privacy legitimately expected and the nature of the governmental

intrusion." ***Commonwealth. v. McCree***, 924 A.2d 621, 626 (Pa. 2007) (internal citations and quotation marks omitted).

Once a defendant files a motion to suppress, the Commonwealth has the burden of proving that the evidence in question was lawfully obtained without violating the defendant's rights. Pa.R.Crim.P. 581(H). Pursuant to Fourth Amendment jurisprudence, there are three categories of interactions between police and a citizen:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

***Commonwealth v. Downey***, 39 A.3d 401, 405 (Pa. Super. 2012), *appeal denied*, 50 A.3d 124 (Pa. 2012) (citation omitted). To find an interaction with police elevated above a mere encounter, we must determine whether the individual was "seized" by police. ***Commonwealth v. Au***, 42 A.3d 1002, 1004 (Pa. 2012).

> To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. In evaluating the circumstances, the focus is directed

toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

*Downey*, 39 A.3d at 405 (citation omitted).

The record in the case at bar reflects that Officer Newcomer obtained the evidence from Fleet after the officer "advised [Fleet] of the situation with the 302 warrant." N.T., 11/15/13, at 8. Officer Newcomer informed Fleet that she was going to be searched and "asked her if she had anything on her," at which point Fleet handed the officer the heroin and syringe. *Id.* at 8-9. It is clear that no reasonable person would have felt free to leave, and that Fleet was therefore "seized" as defined above.[3] *See Downey*, 39 A.3d at 405.

Fleet's seizure occurred as a result of Officer Newcomer's execution of a 302 warrant and Fleet challenged the propriety of the issuance of the 302 warrant. Therefore, the determination of whether that seizure was lawful depends on whether the Commonwealth satisfied its burden of proving at the suppression hearing that the procedural requirements for the issuance of a 302 warrant pursuant to the MHPA were met. *See Commonwealth v.*

---

[3] Our conclusion that Fleet was seized prior to Officer Newcomer obtaining the contraband in question is important because if this had been a mere encounter, Fleet would not be entitled to any redress, as she voluntarily provided the contraband to Officer Newcomer upon being asked "if she had anything on her."

***Jackson***, 62 A.3d 433, 438 (Pa. Super. 2013) (indicating that where evidence is obtained during the execution of a 302 warrant and the defendant challenges the factual basis for the issuance of the 302 warrant, it is the Commonwealth's burden to prove that the 302 warrant was properly issued); ***see also*** Trial Court Opinion, 5/12/14, at 7 (recognizing that it "must determine if the Commonwealth complied with the requirements of a civil involuntary confinement").

> [T]he standard for evaluating the validity of [302] warrants is whether reasonable grounds exist to believe that a person is severely mentally disabled and in need of immediate treatment. … Whether evidence is sufficient to constitute reasonable grounds for purposes of a [302] warrant can only be determined on a case by case basis. … [T]he guiding inquiry must be whether, when viewing the surrounding facts and circumstances, a reasonable person in the position of the applicant for a [302] warrant could have concluded that an individual was severely mentally disabled and in need of immediate treatment.

***In re J.M.***, 726 A.2d at 1049; ***see also Jackson***, 62 A.3d at 439.

Section 7301(a) of the MHPA, governing who may be subject to involuntary emergency examination and treatment, provides:

> Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. **A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal**

**needs is so lessened that he poses a clear and present danger of harm** to others or to himself.

50 P.S. § 7301(a) (emphasis added). Clear and present danger of harm to oneself requires proof that "**within the past 30 days**," one of the following occurred:

> (i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or
>
> (ii) **the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide**; or
>
> (iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

50 P.S. § 7301(b)(2) (emphasis added).

Only a "severely mentally disabled" person, as defined above, may be emergently examined by a physician "upon the certification of a physician

stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination; or without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination." 50 P.S. § 7302(a).

The record reflects that Officer Newcomer was the only witness to testify at the suppression hearing. Although she stated that Fleet's mother came to the police station and indicated that Fleet had threatened to kill herself, the officer provided no indication of when the threats of suicide allegedly occurred. *See generally* N.T., 11/15/13, at 5-7. There was also no testimony that Fleet had previously attempted suicide or testimony that in addition to threatening suicide, Fleet took any actions in furtherance of her suicidal ideations. To the contrary, the record reveals no evidence that in the thirty days prior to Fleet's mother coming to the police station, Fleet engaged in any of the behaviors set forth in section 7301(b)(2) such that she would meet the definition of a person posing a clear and present danger to herself and thus, "severely mentally disabled." *See* 50 P.S. § 7301(b)(2).

As stated above, "severely mentally disabled" is a defined term of art in section 7301(a) of the MHPA. The only evidence of Fleet's mental state presented by the Commonwealth was that at some unknown time, Fleet allegedly sent text messages to her mother indicating that she was contemplating suicide and that she had a conversation with her mother,

again at a time unknown, "about being depressed and wanting to end things." N.T., 11/15/13, at 5-6, 14. The Commonwealth presented no evidence to support a finding that there were reasonable grounds to believe that Fleet was a clear and present danger to herself, and thus "severely mentally disabled," as defined by the MHPA. *See J.M.*, 726 A.2d at 1049; 50 P.S. §§ 7301(a), 7302(a). As such, the Commonwealth failed to satisfy its burden of proving that the 302 warrant was properly issued.

Contrary to the statement by the learned Dissent, the evidence presented in the case at bar in support of the propriety of the issuance of the 302 warrant was not "more compelling" than the testimony in *Jackson*, wherein this Court decided the same issue as is presented in the case at bar and found the 302 warrant was properly issued. Diss. at 5. In *Jackson*, police executed a written 302 warrant issued for Jackson at his house. *Jackson*, 62 A.3d at 435. While there, the police observed drug paraphernalia and "an active marijuana growing operation." *Id.* Thereafter, police obtained a warrant to further search the residence and seize the contraband found. *Id.*

Jackson filed a motion to suppress, asserting, inter alia, that the seizure "was derivative of an invalid mental health warrant which the police used to gain entry to his home." *Id.* The trial court held a suppression hearing, at which the following relevant testimony was provided:

Tracy Semow, a mental health supervisor for Westmoreland Case Management and Supports, testified that in addition to her caseload supervision responsibilities, she assists individuals who have a family member or friend who is a threat to himself or others. On April 5, 2011, she met with [Jackson's father] and his wife and Ms. Bates[, Jackson's paramour], and all three expressed concerns about [Jackson]'s and Ms. Bates'[] safety. Since Ms. Bates was the primary witness to [Jackson]'s conduct and felt personally threatened, she was the designated applicant. Ms. Semow assisted Ms. Bates in completing an application for the warrant that subjected [Jackson] to an involuntary emergency examination and treatment.

Ms. Bates averred in the application that she believed [Jackson] to be severely mentally disabled and a clear and present danger to others. She checked the box on the form providing:

Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is reasonable probability that such conduct will be repeated. A clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm[.][4]

Application for Involuntary Emergency Examination and Treatment, Commonwealth Exhibit 1, at 2.

Ms. Bates handwrote the behavior exhibited by [Jackson] within the past thirty days that supported her belief. Ms. Bates recounted that on March 21, 2011, she and [Jackson] had an explosive argument over trash bags that culminated in [Jackson]

---

4  **See** 50 P.S. § 7301(b)(1) (defining clear and present danger to others).

threatening "to smash [her] face in with those f–––in keys." Ms. Bates also described an incident that occurred on April 4, 2011, the day before the warrant issued. Ms. Bates insisted on driving home from the dentist after [Jackson] had received novocaine. Their two children were in the rear seat of the vehicle. [Jackson] repeatedly yelled at her about her driving and started kicking the dashboard and punching the window to convince her that he should drive. When Ms. Bates declined to relinquish control of the car, [Jackson] told her "No you are going to f–––ing pull over now and let me drive!" When Ms. Bates refused, [Jackson] pushed his feet against the dashboard, which had the effect of pushing his seat into the infant seat located behind him. When Ms. Bates pointed out that the child could be hurt, [Jackson] put his hand on the keys in the ignition, threatening to remove them.

When Ms. Bates continued to refuse to allow [Jackson] to drive, he began punching the window on the passenger side of the vehicle. He again insisted that she turn over the wheel, and when she declined, he threatened, "I will beat your face in with a baton until there is a big gaping hole in your head!"

At that point, Ms. Bates directed the car away from their home, intending to go directly to the police station. [Jackson] noticed and became more violent. As Ms. Bates was entering a turn, [Jackson] grabbed the keys in the ignition and turned off the car, blocking traffic in all directions. He then jumped from the car and ordered her to exit the car. Ms. Bates restarted the car and attempted to drive it. [Jackson] stood in front of the car, took his baton, and smashed it against the passenger side window. At that point, Ms. Bates proceeded to the local police department where she filed a report of the incident.

Ms. Semow read the application in its entirety over the phone to Dawn Hixon, a Westmoreland County mental health delegate. Based on Ms. Bates'

- 15 -

> account, Ms. Hixon approved the warrant that permitted the police to apprehend [Jackson] and take him to the nearest emergency room for evaluation. Ms. Semow then signed the warrant. At the suppression hearing, Ms. Semow verified her signature on the 302 warrant and confirmed that the information contained therein was the information Ms. Bates transcribed in Ms. Semow's presence.

*Id.* at 435-37 (footnote added; some record citations omitted). The trial court denied suppression.

Following his convictions of drug-related charges, Jackson appealed to this Court. On appeal, this Court evaluated the evidence presented by the Commonwealth at the suppression hearing and determined that it supported the trial court's finding that Jackson was "severely mentally disabled," as he was a clear and present danger to others as defined by section 7301, and that the 302 warrant was properly issued. *Id.* at 440. We thus concluded that the police were lawfully present in Jackson's home by virtue of the properly procured 302 warrant; police viewed the contraband in plain view; and the resulting issuance of a search warrant and the seizure of the drugs and paraphernalia by police were permissible. *Id.*

In *Jackson*, the Commonwealth provided testimony to establish that Jackson was engaging in behaviors during the preceding thirty days that made him a clear and present danger to others, and therefore "severely mentally disabled" as defined by the MHPA. In the case before us, on the other hand, the Commonwealth did not present any evidence to support a

finding that the 302 warrant was properly procured. Although the Dissent states, "Officer Newcomer viewed text messages from [Fleet] in which she articulated a **clear and immediate intent to kill herself**," Diss. at 5 (emphasis added), there is no support in the record for such a conclusion. As stated hereinabove, the Commonwealth presented no evidence regarding when Fleet allegedly sent the text messages or any specificity as to the content of the messages. Officer Newcomer only testified that Fleet's mother came to the police station and showed her text messages, allegedly sent by Fleet at some unknown time, indicating that Fleet was contemplating suicide and that Fleet's mother had a conversation with Fleet, again at a time unknown, "about being depressed and wanting to end things." N.T., 11/15/13, at 5-6, 14.

The Dissent's alternative argument – that Officer Newcomer's seizure of Fleet was "reasonable" "even if the warrant was technically defective pursuant to the procedural prerequisites of the MHPA" – is also erroneous. **See** Diss. at 6-11. This was not a mere technical defect in the 302 warrant as the Dissent suggests; this was a wholesale failure to establish that Fleet was the proper subject of an emergency examination under the MHPA. **See** 50 P.S. § 7302(a) (permitting transportation of a person to a treatment facility for emergency examination **only if** there are "reasonable grounds to believe a person is **severely mentally disabled** and in need of immediate treatment," either as provided in a warrant for emergency examination or

upon personal observation of the person's conduct) (emphasis added). As stated above, Officer Newman's testimony did not establish that Fleet was "severely mentally disabled" as defined by the MHPA or in need of immediate treatment. As such, the Dissent's conclusion that the Commonwealth established "that probable cause existed for the belief that [Fleet] was severely mentally disabled" is unsupportable under the law.[5] Diss. at 10-11.

We agree with the Dissent that the Commonwealth need not prove that Fleet was, in fact, "severely mentally disabled" to establish that the 302 warrant was properly issued. *See* Diss. at 3-4. Rather, as stated supra, the Commonwealth had the burden of proving that there were reasonable grounds to believe that Fleet was "severely mentally disabled" as defined by the MHPA and in need of immediate treatment. *See J.M.*, 726 A.2d at 1049; 50 P.S. §§ 7301(a), 7302(a). In finding that the Commonwealth satisfied its burden in this regard, the Dissent wholly ignores the definition under the MHPA of who is subject to a 302 warrant and the paucity of evidence produced by the Commonwealth at the suppression hearing. The Commonwealth failed to produce the text messages Fleet allegedly sent;

_____

[5] We note that it is entirely possible that Fleet was the proper subject of a 302 warrant and lawfully committed pursuant thereto. Our decision here does not address that question. Rather, our inquiry is simply whether the Commonwealth satisfied its burden of proving that it lawfully obtained the contraband in question. As the Commonwealth obtained the contraband during the execution of a 302 warrant, and Fleet challenged the validity of the 302 warrant in a suppression motion, pursuant to *Jackson*, the Commonwealth in the case at bar had the burden of proving that the 302 warrant was properly issued. *See Jackson*, 62 A.3d at 438.

failed to call any witnesses to testify regarding the content of those messages or the information contained in the application for the 302 warrant; and failed to produce any evidence pertaining to when Fleet allegedly sent the messages or when the conversation with her mother "about being depressed and wanting to end things" occurred. Stated otherwise, the Commonwealth failed to establish that the requirements for obtaining a 302 warrant were met. As such, the Commonwealth failed to satisfy its burden of proof on this predicate issue and we have no basis from the record to conclude that Fleet was lawfully detained prior to the search.

> Where a court finds that a person was illegally seized before he allegedly consented to a search, any evidence obtained as a result of the search must be excluded from the evidence against the accused as fruit of the poisonous tree, i.e., the unlawful seizure, unless the prosecution can establish that the alleged consent was not a result of the illegal seizure.

*Commonwealth v. Reid*, 811 A.2d 530, 544-45 (Pa. 2002) (citation omitted).

We therefore conclude that the trial court erred by denying Fleet's motion to suppress the heroin and syringe recovered from her person by Officer Newcomer and reverse that decision. As Fleet's conviction of possession of a controlled substance was based entirely upon the now-suppressed evidence, we vacate the judgment of sentence.

Order denying suppression reversed. Judgment of sentence vacated. Jurisdiction relinquished.

Ford Elliott, P.J.E. joins the Opinion.

Allen, J. files a Dissenting Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/16/2015

- 20 -