J-S08016-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: R.W.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1087 MDA 2020 |

Appeal from the Order Entered July 29, 2020,
in the Court of Common Pleas of Cumberland County,
Civil Division at No(s): 2020-01003.

BEFORE:   STABILE, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:                    **FILED APRIL 30, 2021**

R.W.W. (Appellant) appeals the order denying his petition to expunge the record of his involuntary commitment under the Mental Health Procedures Act (MHPA) and the Uniform Firearms Act. **See** 50 P.S. §§ 7301-7302; **see also** 18 Pa.C.S.A. § 6111.1(g). After careful review, we affirm.

The relevant factual and procedural history is as follows: In the evening of December 20, 2018, Appellant had an argument with his wife after he discovered evidence of an affair. His wife then left the home to de-escalate the situation. Appellant had already been drinking and continued to do so into the morning hours. Around this time, Appellant texted to his mother a photo of himself lying on his bed. Visible in the photo was a handgun placed near his head. Appellant then called his mother. During the conversation,

_____

[*] Former Justice specially assigned to the Superior Court.

Appellant further threatened self-harm, asking her, "Is this what you want?" *See* Exhibit 1 (Appellant's medical records). Evidently, Appellant's family was so concerned for Appellant's welfare, they called the Upper Allen Township Police.

The police coordinated with the family so Appellant would peacefully meet the arriving Officer Kramer outside of the house and unarmed. Appellant admitted to Officer Kramer he was sitting upstairs with his guns, that he did not know what he was going to do, that the situation was his wife's fault, and in apparent reference to her infidelity, Husband stated: "This is what makes me want to put a gun in my mouth." *Id.* Believing Appellant was mentally unstable, and a danger to himself and others, the police transported Appellant to the emergency room of a local hospital without a warrant.

Appellant arrived at 4:27 a.m., and the officer filled out an application for an involuntary emergency examination under Section 7302 of the MHPA, "alleging that [Appellant] had attempted suicide and there was a reasonable probability of suicide unless treatment was provided."[1] Upon his arrival, Appellant gave bloodwork, had his vital signs taken, and was seen by a physician. Appellant had a BAC of .239% and was medically cleared around noon. At 12:45 p.m., Dr. Luke Chetlan signed off on the application for involuntary emergency examination and treatment. Appellant's principal diagnosis was relationship distress with his spouse. He was transferred to the

---

[1] This procedure is known colloquially as a "302" commitment.

hospital's mental health unit but was discharged a few days later on December 24, 2018.

On January 29, 2020, Appellant filed a petition to expunge the record of his involuntary commitment. The petition was opposed by the Pennsylvania State Police and the Cumberland-Perry Office of Mental Health, Intellectual and Developmental Disabilities (MH-IDD). At the expungement hearing on May 29, 2020, the court heard testimony from Appellant and his wife (with whom he reconciled) and reviewed Appellant's medical records. The court accepted post-hearing memoranda and took the matter under advisement before ultimately denying Appellant's petition. *See* Opinion and Order of Court, 7/28/20, at 1-13.[2]

Appellant timely filed this appeal and presents the following issues for our review:

> 1. […] Was there sufficient evidence for a 302 commitment?
>
> 2. […] Did the trial court err in finding that the Mental Health Procedures Act was not violated[, where the authorities transported Appellant to the hospital without a warrant and without personally observing his conduct]?
>
> 3. […] Did the trial court err in holding [that Appellant's due process rights were violated because Appellant was not evaluated within two hours as required by the Mental Health Procedures Act]?

*See* Appellant's Brief at 5 (superfluous averments omitted).

_____

[2] The trial court issued a statement in lieu of an opinion, directing this Court's attention to the opinion accompanying its order.

In his first issue, Appellant argues the court erred in determining there was sufficient evidence to authorize his involuntary commitment. *See* Appellant's Brief at 11. The procedure by which the trial court reviews these types of expungement petitions is well-defined.

Section 6111.1(g)(2) of the Uniform Firearms Act allows an individual who was involuntarily committed under 50 P.S. § 7302 to petition the trial court "to review the sufficiency of the evidence upon which the commitment was based." Pa.C.S.A. § 6111.1(g)(2); *see also In re M.B.*, 228 A.3d 555, 576 (Pa. Super. 2020). Upon review, if the trial court "determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged." *Id.*

As Appellant rightly acknowledges, the trial court must review the evidence through the lens of the examining physician:

> The plain language of Section 6111.1(g)(2) requires a court of common pleas to review only the sufficiency of the evidence to support the 302 commitment, limited to the information available to the physician at the time he or she made the decision to commit the individual, *viewed in the light most favorable to the physician* as the original decision-maker to determine whether his or her findings are supported by a *preponderance of the evidence*.

*In re Vencil*, 152 A.3d 235, 237 (Pa. 2017) (emphasis added); *see also* Appellant's Brief at 11.

In turn, we review the trial court's sufficiency determinations for an abuse of discretion. *See In re A.J.N.*, 144 A.3d 130, 134 (Pa. Super. 2016)

(citations omitted). With the sufficiency standard in mind, we identify the relevant substantive law under which Appellant was involuntarily committed.

Pursuant to the MHPA, a person may be subject to involuntary examination and treatment by a physician – *i.e.*, committed – when there are reasonable grounds to believe he or she is severely mentally disabled and in need of immediate treatment. **Vencil**, 152 A.3d at 237 (citing 50 P.S. § 7302(a)). An individual is "severely mentally disabled" if "as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or himself." 50 P.S. § 7301(a).

What constitutes a "clear and present danger" is also defined by statute. **See generally** 50 P.S. § 7301(b)(1)-(2)(i-iii). Instantly, Appellant was determined to have posed a clear and present danger under Section 7301(b)(2)(ii), which provides:

> (2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:
>
> [...]
>
> (ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. [....]

50 P.S. § 7301(b)(2)(ii).

In this context, "a suicide attempt" is a legal term of art. A suicide attempt can be shown by "threats to commit suicide" and the commission of

"acts which are in furtherance of the threat to commit suicide." 50 P.S. § 7301(b)(2)(ii); **see also** 55 Pa. Code § 5100.84(g)(1) ("An attempt under [Section 7301(b)(ii)] occurs[ w]hen a person clearly articulates or demonstrates an intention to commit suicide…and has committed an overt action in furtherance of the intended action[.]").

Here, Appellant presents two primary reasons why there was insufficient evidence to support his involuntary commitment. We discuss each in turn.[3] First, Appellant argues he did not pose a clear and present danger by suicide attempt, because he never threatened self-harm. But even if he made a threat, Appellant argues he still never took the requisite act in furtherance of the threat. He reasons that the photo cannot be both a threat and the furtherance of the threat. **See** Appellant's Brief at 14.

We note here that the trial court did not determine that the photo consisted of both the threat and the act in furtherance. When it viewed the evidence in a light most favorable to the examining physician, the trial court determined that the threats consisted of the photo Appellant texted to his mother, combined with his statements made to his mother and to Officer Kramer about how his wife's infidelity made him want to put a gun in his mouth. **See** Opinion and Order of Court at 11. The trial court determined

---

[3] We note Appellant alludes to a third reason that the evidence was insufficient, *i.e.* the physician did not examine him within the requisite timeframe. Because Appellant raises the timing of his examination as his third issue on appeal, we address it separately from our sufficiency analysis.

that the act in furtherance of these threats was Appellant's **retrieval** of a gun from a drawer in his bedroom. **Id.** (emphasis added).

Returning to Appellant's argument, his rationale is predicated upon a narrow interpretation of what constitutes a threat and what constitutes an act in furtherance of a threat. Such a narrow reading of the statute simply does not comport with our case law. For instance, in **Commonwealth v. Smerconish**, 112 A.3d 1260 (Pa. Super. 2015), we concluded that there was sufficient evidence of a threat, where an individual sent instant messages to his sister, stating he did not want to live as a failure. We also concluded that the act in furtherance of that threat consisted of the individual's internet searches about painless methods of suicide. **See Smerconish**, 112 A.3d at 1263-1264.

**Smerconish** is also instructive for another reason. The question of whether an individual committed acts in furtherance of the threat is not strictly a temporal one. In **Smerconish**, the individual committed acts in furtherance when he researched on the internet painless ways to commit suicide. **Id.** at 1264. However, the individual's threats came after, when he messaged his sister to informing her of his research and desire to take his own life. **Id.** Such a conclusion is perfectly logical, as one might take overt steps closer to suicide, before articulating to another person his intention to do so. Afterall, a "suicide attempt" for the purposes of the MHPA simply consists of a threat and an act in furtherance; that is, a clear articulation or demonstration of an intention to commit suicide, and an overt action in furtherance of the intended

- 7 -

action.  *See* 50 P.S. § 7301(b)(2)(ii); *see also* 55 Pa. Code § 5100.84(g)(1); *and see Commonwealth v. Jackson*, 62 A.3d 433, 440 (Pa. Super. 2013) ("[T]he overt act requirement does not require proximity or the immediate ability to carry out the threat.") (Citation omitted). Both elements are required, but not necessarily in an ordered sequence.

Here, Appellant made similar threats of self-harm to his mother, via the texted photo and statements during the phone call.  He also threatened self-harm when he told Officer Kramer that his wife's infidelity made him want to put a gun in his mouth.  Appellant acted in furtherance of the threat when he retrieved the gun from where it was stored in the bedroom.  That the gun was allegedly unloaded, and the fact Appellant eventually put the gun away before meeting the police, do not negate the overt action he undertook.  Likewise, it does not matter whether Appellant's retrieval of the gun preceded Appellant's threats to his mother or Officer Kramer.

Appellant further argues that because the Respondents did not present witnesses, his testimony alone must be controlling, and his threats disregarded.  *See* Appellant's Brief at 14.  We disagree. Although the only witnesses at the expungement hearing were Appellant and his wife, the court was under no obligation to accept Appellant's version of the facts.  Contrary to his position on appeal, Appellant's testimony was not unimpeachable.  His testimony was still subject to cross-examination and the proper inferences made therefrom.  Perhaps more importantly, the court also had to consider

the information disclosed in his medical record (Appellant's Exhibit 1), which often contradicted Appellant's position.

All must be viewed in light most favorable to the physician. In that vein, we observe the court did not find Appellant's testimony to be particularly persuasive. Appellant conceded on cross-examination he did not know why he took the gun out, and admitted he was "fairly upset that evening on an emotional sense." **See** N.T., 5/29/20, at 31. Appellant also repeatedly asserted he could not remember those details which were the most adverse to his case. Just because Appellant had incomplete recollection, does not mean the trial court was bound by Appellant memory, especially when it was contradicted by the medical records. We conclude the trial court did not abuse its discretion when it found sufficient evidence that Appellant posed a clear and present danger under Section 7301(b)(2)(ii).

Appellant's other claim of insufficiency is that he was never actually diagnosed with a mental health illness. To explain, involuntary commitment is proper when a person is "severely mentally disabled." In turn, a person is severely mentally disabled when, **as a result of mental illness**, the person displays such incapacity that he poses a clear and present danger. **See generally** 50 P.S. § 7301(a) (emphasis added). Appellant claims he cannot be "severely mentally disabled" for purposes of the MHPA, regardless of whether he posed a danger, because he was never diagnosed with specific, official mental health illness. **See** Appellant's Brief at 14-15. Indeed,

Appellant suggests that any danger he posed was attributable to his alcohol intoxication. *Id.* at 15.

We conclude Appellant's reasoning on this point lacks merit as well. Again, Appellant narrowly constructs the statute without citation to legal authority. In essence, Appellant would have us put the cart before the horse by mandating that the physician render a formal mental health diagnosis, before committing an individual, on an emergency basis, for further examination. More pointedly, Appellant's argument fails on its own terms. Contrary to Appellant's characterization of the facts, there **was** an actual mental health diagnosis - namely, that Appellant suffered from the distress brought on by his marital relationship. In the examining physician's view, this was the principal diagnosis; Appellant's intoxication was only secondary. **See** Exhibit 1. The trial court necessarily had to view this finding in a light most favorable to the physician, and when it did so, the court determined there was sufficient evidence Appellant was "severely mentally disabled" for purposes of Section 7301(a). We discern no abuse of discretion here either. Appellant's first issue fails.

In his second issue, Appellant argues his right to due process was violated when the police transported him to a hospital and sought his commitment without a warrant. **See** Appellant's Brief at 15. As Appellant argues the trial court committed an error of law, our standard of review for this claim is *de novo* and our scope plenary. **See G.V. v. Department of Public Welfare**, 91 A.3d 667, 670 n.5 (Pa. 2014) (citation omitted).

- 10 -

Pursuant to 50 P.S. § 7302(a)(2), an emergency examination may be undertaken at a treatment facility upon a warrantless application by a police officer, so long as the officer personally observed the conduct showing the need for such examination. Appellant maintains a warrant was necessary in this case, because the officer did not personally observe Appellant's threatening conduct. **See** Appellant's Brief at 15. He concludes such a violation demands an expungement of his record, notwithstanding the merits of the involuntary commitment.

Appellant does not exaggerate the rights at stake, nor the remedy available to him if his constitutional right to due process was circumvented. Although the government has inherent police powers to commit persons who are a danger to themselves or others, the confined person also has "a countervailing liberty interest protected by the due process clause of the Constitution." **In re A.J.N.**, 144 A.3d 130, 137 (Pa. Super. 2016) (citation omitted); **see also** U.S.C.A. Const. Amend. 14. The enactment of the MHPA is "an enlightened legislative endeavor to strike a balance between the state's valid interest in imposing and providing mental health treatment and the individual patient's rights." **Id.** (citation omitted). The MHPA specifically embodies these principles by stating that its provisions must "be interpreted in conformity with the principles of due process[.]" **Id.** (quoting 50 P.S. § 7102). This means the strict conditions of Section 7302(a) must be satisfied before a court order for commitment shall be issued.

When the conditions are not strictly adhered, the remedy is expungement. "Even before enactment of the MHPA, our case law provided that, if a person is involuntarily committed in violation of his due process rights, he is entitled to expungement of the proceedings and the destruction of all records relating thereto." *Id.* (citing *Wolfe v. Beal*, 384 A.2d 1187 (Pa. 1978). "Thus, the case law uniformly mandates expungement and destruction of records when the procedural, due process requirements of the MHPA are violated during a commitment proceeding." *Id.* at 139.

In the instant matter, Appellant first notes Officer Kramer never saw the photo Appellant texted to his mother, and that he was unarmed and compliant when he came out of his house. *See* Appellant's Brief at 16. He also argues Officer Kramer never heard Appellant make a threat to self-harm. Appellant analogizes this case to *A.J.N.*, *supra.* In that case, the authorities did not obtain a warrant until after Appellant arrived at the facility. *A.J.N.*, 144 A.3d at 136. When a warrant was eventually procured, it was based solely on the representations made by the individual's grandparents. *Id.* The police did not personally observe the individual's behavior. *Id.*

Here, as in *A.J.N.*, the impetus for the police involvement was the representations made by family members that Appellant threatened self-harm. And, like in *A.J.N.*, Appellant was transported without a warrant. But this is where the similarities end. Although the Officer Kramer had not personally seen the photo Appellant sent to his mother, the officer was aware the family thought Appellant was suicidal and in possession of firearms. When

the officer spoke with Appellant, presumably to obtain the veracity of the family's representations, Appellant confirmed he was sitting upstairs with guns and stated he did not know what he was going to do, but that his wife's infidelity "is what makes me want to put a gun in my mouth." *See* Exhibit 1. Not only did the officer hear these threats firsthand, the officer also personally observed Appellant's demeanor, and believed him to be not only intoxicated, but "mentally and emotionally unstable to the point that Appellant was a danger to himself and others." *Id.* These additional facts were critical, and they embody the fundamental distinction from *A.J.N.* In this case, the authorities strictly adhered to the conditions of Section 7302(a) and the constitutional balance was maintained. No warrant was necessary; Appellant's second issue is without merit.

Appellant's third and final issue questions whether the physician properly examined him as mandated by Section 7302(b). As this contention also implicates his right to due process (*see In re T.B.*, 113 A.3d at 1273 (Pa. Super. 2015)), our standard of review remains *de novo* and our scope plenary. *See G.V.*, 91 A.3d at 670 n.5 (citation omitted). Section 7302(b) provides: "A person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely mentally disabled within the meaning of [Section 7301(b)] and in need of immediate treatment." Here, too, circumvention of this process results in expungement: "[A] person who has been unlawfully committed to a [] mental facility has a constitutional right to the destruction of hospital records created as a result

- 13 -

of the illegal commitment." **T.B.**, 113 A.3d at 1275 (citing **Wolfe v. Beal**, 384 A.2d 1187 (Pa. 1978)).

Instantly, Appellant arrived at the hospital at 4:27 a.m., triggering a two-hour window whereby he had to have been examined for severe mental disability. Appellant concedes he was examined by a physician shortly after his arrival, but he maintains the examination was statutorily deficient. **See** Appellant's Brief at 19-20. He explains that the purpose of this examination was only to diagnose his **physical** health – *i.e,* check his vital signs and draw blood – but he argues he was never examined to determine severe mental disability. Thus, Appellant reasons, the statutory window was closed by the time the physician ultimately executed 302 commitment at 12:45 p.m., some six hours beyond what Section 7302(b) allows. Alternatively, Appellant argues the physician who signed the 302 commitment never examined him until after he signed the document. **See id.** at 13. Appellant's insinuation is that Section 7302(b) mandates that the physician who signs the 302 commitment must be the same physician who examines the individual.

In its review, the trial court determined that the initial examination sufficed. But we observe the court also seemed satisfied by an alternative explanation advanced by the Pennsylvania State Police and the Cumberland-Perry MH-IDD. They reasoned that the attending physician immediately began diagnostic testing upon Appellant's arrival, but had to wait until Appellant was medically cleared – that is, wait until Appellant's blood alcohol level could stabilize - before the physician could discern whether Appellant's

condition could be attributed to severe mental illness. **See** Opinion and Order at 13; **see also** Cumberland-Perry MH-IDD's Brief at 16; **and see** Pennsylvania State Police's Brief at 13.

We are somewhat troubled by the rationale advanced by the Respondents. Although it would appear reasonable for an attending physician to wait until a patient was medically stabilized in order to discern whether patient's condition was caused by mental health illness or another type of medical issue, that does not appear to have been the case here. If anything, the physician waited until Appellant was medically cleared to begin **treating** Appellant's mental health, not to make the initial determination of his mental health. There is no evidence the physicians examined Appellant after he stabilized at noon, but before the application was signed at 12:45 p.m. Be that as it may, the timing of the commitment execution is largely irrelevant to our disposition. What matters is whether the physician examined Appellant within two hours of his arrival.

After review, we conclude that the statutory conditions were satisfied. Appellant admitted that a physician examined him within the requisite timeframe. In light of this acknowledgement, we question whether any of Appellant's subsequent arguments merits relief. Nevertheless, we briefly address his contentions.

We are not persuaded by Appellant's claim that the initial examination failed to examine his mental health. This position conflicts with the physician's observations in the 302 commitment form, which commemorates the

conversation the physician had with Appellant about his mental health and aforementioned threats. *See* Exhibit 1. But even if the physician did not question Appellant about his mental health, it does not necessarily mean the physician failed to examine the same. Moreover, Appellant had only a vague recollection about what happened after he arrived at the hospital. Appellant could not testify about who treated him and when, at least not with a requisite specificity to overcome the physician's determinations provided in his medical records. *See* N.T., at 23.

This same vague testimony also undermines Appellant's alternative argument that the physician who signed his 302 commitment was not the same physician who initially examined him. We understand Appellant's claim. Appellant testified that he was only examined by a physician once, before he was informed that the 302 commitment had been signed. The commitment was signed by Dr. Chetlan, but the medical records also reveal an emergency room consultation by psychiatrist Dr. Srinivasa. Again, however, Appellant could not recall who initially examined him when he arrived at the hospital. Given that all of Appellant's arguments are predicated on factual disputes, we must observe the deference entitled to the physician on all these points. Therefore, we find the court did not err when it determined Appellant was properly examined within the statutory timeframe. Appellant's third issue has no merit.

To conclude: the trial court did not err when it determined there was sufficient evidence warranting Appellant's involuntary commitment.

Appellant's demonstrated incapacity was brought on by distress from the marriage, and such incapacity caused Appellant to pose a clear and present danger, as evidence by his threats and act in furtherance. Consequently, Appellant was severely mentally disabled for purposes of the MHPA. Appellant's right to due process was not violated when the officer sought a commitment without a warrant, because the officer personally observed Appellant's need for treatment. Finally, the record indicates Appellant's right to due process was not violated, because he was properly examined within the statutory timeframe.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/30/2021